GUS. WEINECKE V. STATE OF NEBRASKA.

[FILED FEBRUARY 17, 1892.]

1. **Criminal Law**: OBSTRUCTIONS ON RAILROAD TRACK. *Held,* That the evidence justifies the finding of the jury that the defendant was guilty of willfully and maliciously placing an obstruction upon the railroad track as alleged in the information.

2. ———: CONFESSIONS. When the crime charged is fully established by competent testimony, the free and voluntary confession of the defendant may be proven for the purpose of connecting him with the offense. .

3. ———: CONVICTION ON ONE COUNT, ACQUITTAL ON ANOTHER. The information contains two counts, each charging a separate offense. There was a verdict of guilty under one count, and an acquittal of the other, though the evidence would have justified a conviction of both offenses charged. *Held,* That the findings are not inconsistent with each other, and that the accused was not prejudiced by the findings returned in his favor.

4. ———: THE VENUE OF AN OFFENSE MAY BE PROVEN like any other fact in a criminal case. It need not be established by direct testimony, nor in the words of the information, but if from the facts in evidence the only rational conclusion which can be drawn is that the crime was committed in the county alleged, the proof is sufficient.

5. ———: VARIANCE.  There is no variance between the allegations of the second count of the information and the evidence introduced in support thereof.

6. ———: SENTENCE: REVIEW.  When the sentence imposed in a criminal case is within the limits fixed by statute, it will not be disturbed, unless it appears that there has been an abuse of discretion.

ERROR to the district court for Merrick county.  Tried below before POST, J.

*A. Ewing,* for plaintiff in error.

*Geo. H. Hastings,* and *W. T. Thompson, contra,* cited: 1 Greenleaf, Ev., secs. 6, 217, 219; 1 Bishop, Crim. Proc., secs. 348, 488b; *People v. Manning,* 48 Cal., 335; Wharton, Crim. Ev. [9 Ed.], sec. 108; *State v. Turner,* 6 Bax. [Tenn.], 201; *Casey v. State,* 20 Neb., 159; 2 Thompson, Trials, sec. 2606.

NORVAL, J.

The information upon which the plaintiff in error was tried contains two counts.  In the first count the accused is charged with willfully and maliciously displacing and removing the spikes and bolts from one of the rails of the track of the main line of the Union Pacific railroad.  By the second count he is charged with willfully and maliciously placing an obstruction upon and across the track of said railroad.  Upon the trial the plaintiff in error was acquitted upon the first count, and a verdict of guilty was returned upon the second count of the information.  A motion for a new trial was filed, alleging the following grounds:

"1. The verdict is not sustained by sufficient evidence.

"2. The verdict is contrary to law.

"3. Error of law occurring at the trial."

The motion was denied, and thereupon the defendant

was sentenced to imprisonment in the penitentiary for five years.

The prosecution was brought under section 93 of the Criminal Code, which provides that "every person who shall willfully and maliciously remove, break, displace, throw down, destroy, or in any manner injure any iron, wooden, or other rail, or any branches, or branchways, or any part of the tracks, or any bridge, viaduct, culvert, trestle work, embankment, parapet, or other fixture, or any part thereof, attached to or connected with such tracks of any railroad in this state, now in operation, or which shall hereafter be put in operation, or who shall willfully and maliciously place any obstruction upon the rail or rails, track or tracks, of any such railroad, shall be punished by imprisonment in the penitentiary not less than one year nor more than twenty years," etc.

Neither in the petition in error nor the brief filed is any complaint made of the instructions, or of any ruling of the trial court in the admission and rejection of testimony, but the principal ground urged for reversal is that the verdict is not justified by the evidence.  By undisputed testimony it is shown that near 12 o'clock of the night of August 24, 1890, and a short distance from the town of Chapman, in Merrick county, all the spikes and bolts were removed from one of the rails which formed a part of the main track of the railroad, then owned and operated by the Union Pacific Railway Company, and a steel claw-bar, about six feet long and two inches thick, was placed in such position upon one of the rails of the track and against a tie, as would most likely have derailed a train, had one attempted to pass.  The testimony also shows that the tool house of the company at Chapman station was broken open and the claw-bar in question taken therefrom. Shortly after 12 o'clock of the night referred to, the defendant went into the office of the railway company at Chapman and informed the night operator that the track

had been tampered with.  The section men were at once notified, who soon made the necessary repairs.  At the request of the operator, the defendant accompanied the section men and showed them the place.  He returned with the men to Chapman, where, shortly thereafter, he was arrested upon the charge for which he was subsequently tried and convicted.  Soon after the defendant's arrest he was placed in jail at Grand Island, where he occupied a cell with one John Mulroy, who was detained therein as a witness for the state in a criminal case pending in Hall county.

Upon the trial of the defendant, John Mulroy was called as a witness for the state, who testified on direct examination, as follows:

Q. Did you ever see the defendant before?

A. Yes, sir.

Q. Where did you see him?

A. In Grand Island.

Q. In the jail at Grand Island?

A. Yes, sir.

Q. You was there detained as a witness?

A. Yes, sir.

Q. When did you see him?

A. The morning after he done this act.

Q. Do you know the time he was brought to jail there —about the time?

A. Yes, sir; it was Monday morning, about 5 o'clock.

Q. On that day did you hear him say, or anything said, in regard to what he was there for?

A. No, sir; not right then.

Q. When did you?

A. The next day after.

Q. What did you hear?

A. The next night he was crying in bed.

Q. Whether you know what he was there for?

A. Yes, sir; he asked me what I was in for, and I told him; and I asked what he was in for, and he told me.

Q. What did he say?

A. He said on account of the train wreck; he tried to wreck a train down here, and that was what they had him for.

Q. Did he sleep with you?

A. Yes, sir; in the same bed with me.

Q. Did you, after that time, hear him say anything about the matter?

A. Yes, sir; that night when I went to bed he was laying in bed, and he was crying, and I asked what was the matter; he said he was sorry, and I says, sorry for what? he said sorry for doing it; and I said, did you do it? and he said yes; and I said, what did you do it for? and he said he thought he could make some money; and I got up and told the watchman outside; and then I went up and told the prisoners in the jail—told them all.

A rigid cross-examination of the witness failed to break down or impair his testimony given in chief, but shows that he was a disinterested witness and had no bias or prejudice against the accused.

Fred. G. Schaffer, the deputy sheriff of Merrick county, testified, in effect, that a short time before the trial the defendant stated to the witness that he displaced the rail and placed the obstruction upon the track.

The defendant testified that he started on foot from Grand Island between 3 and 4 o'clock in the afternoon of August 24th, following the railroad track to a point about half mile west of Chapman. It being about dusk and having no money to pay for lodging, he went into a cornfield about three rods from the railroad, made a bed upon the ground with his overcoat and some corn-stalks, where he laid down and went to sleep. We quote from the record his version of what took place: "I commenced to sleep, and after I woke up again I heard a train come, and I woke up again and laid down a while then, and I woke up and heard somebody pounding on the iron, and I went

up and looked at it, and I thought it was the section men, and I saw two men there working, and I went back again and laid down and thought over it, that I didn't see any lights, and I went out again and saw what they were doing there; and I went to the railroad crossing a little further down there, and them fellows saw me and hollowed to me to stay there or come up to them, and I didn't go and they commenced to swear and come up to me; and I went down the track and soon as I commenced to go down they commenced to run after me and I run too, and afterwards they shot at me, and I went to the depot and told the night operator what I saw there."

On cross-examination the defendant testified, among other things, as follows:

Q. How long do you think you had been asleep before you woke up?

A. I couldn't tell how long it was.

Q. What woke you up?

A. First I heard a train coming by.

Q. Did the train go by? .

A. Yes, sir.

Q. How long after the train went by was it before you heard these men at work?

A. Must be a half an hour or something like that.

Q. And you was awake all that time?

A. I was laying down, kind of dozing.

Q. You wasn't fast asleep?

A. No, sir.

Q. And you was kind of awake for about a half an hour?

A. Yes, sir.

Q. And then you heard what?

A. Somebody working on the railroad with irons. Somebody pounding.

Q. Did you hear any voices?

A. Yes, sir; I heard someone talk.

Q. Could you understand what they said, whether they were talking in English or some other language?

A. No, sir; I could not tell.

Q. How long did you hear them pound this way before you got up and went towards them?

A. I looked up and went up there.

Q. Did you get up on your feet?

A. Yes, sir.

Q. And could you see anybody?

A. No, sir.

Q. You went out of the corn-field?

A. Yes, sir.

Q. And why couldn't you see them, was the corn so high?

A. The corn was in the road there.

Q. And then what did you do?

A. I went out to the road and then I seen two men there.

Q. How far was these two men from you when you got to the edge of the corn?

A. They were a little ways.

Q. Were they as far as from here to that door over there?

A. No, sir; they were not quite so far.

Q. What did they say to you?

A. They didn't say anything then; I thought it was the section men and I went back.

Q. Went back to bed?

A. Yes, sir; and I laid down again and thought on it, and if the section men ought to have some light of some kind, and I didn't see any light.

Q. When you went out to the edge of the corn you could see these men at work, could you?

A. Yes, sir.

Q. And they could see you if they looked?

A. Yes, sir.

Q. And they kept on with the work?

A. Yes, sir.

Q. And they had no light?

A. No, sir.

Q. And it was a rather cloudy night?

A. Yes, sir.

Q. And you went back to your bed?

A. Yes, sir.

Q. How long did you stay there before you heard any more noise?

A. I heard a noise right along.

Q. You didn't say a word?

A. No, sir.

Q. They kept at work?

A. Yes, sir.

Q. And you went out again?

A. Yes, sir.

Q. Why?

A. I wanted to see what was there.

Q. Because you thought they didn't have any light?

A. Yes, sir.

Q. And section men would have a light?

A. Yes, sir.

Q. And you didn't think of that till you got back to your bed?

A. No, sir.

Q. And you went where, then?

A. To the crossing.

Q. How far was that from where they went to work?

A. About three or four rods, I guess.

Q. And then what took place?

A. I stood there, and I guess they seen me or heard me and they hollowed at me.

Q. What did they hollow to you?

A. What am I doing there?

Q. What else did they say to you?

A. They came to me.

Q. You said on your direct examination they hollowed to you to come to them?

A. No, sir.

Q. I understood you to say they hollowed to you to come and you started the other way. What did they say to you?

A. They hollowed to me what am I doing there?

Q. What you were doing there?

A. Yes, sir.

Q. More than one hollow?

A. Yes, sir; only that one fellow hollowed at me.

Q. Hollow loud?

A. Yes, sir.

Q. Did he swear?

A. Yes, sir—called me names and everything.

Q. Did he swear before you started to run?

A. Well, so soon as he commenced to swear at me I went down the road and when I commenced to run he commenced to call me bad names.

Q. You went down the railroad?

A. Yes, sir.

Q. Toward Chapman; you run down that way?

A. Yes, sir; towards Chapman.

Q. And he kept hollowing for you?

A. Yes, sir.

Q. And then what else did they do.

A. After they run after me and I run too they commenced to shoot at me too.

Q. How many shots?

A. Four shots.

Q. Did you count them?

A. I heard four shots.

Although the defendant denies under oath that he com-·mitted the offense, the weight and credit to be given his testimony was for the jury to determine after they had

considered all the facts and circumstances in evidence. In weighing the testimony, they doubtless, as they had a perfect right to do, took into consideration his interest in the result of the case, the reasonableness of his story as to his whereabouts and actions on the night the offense was committed, and his admissions made out of court. We are not surprised that the jury did not accept the defendant's story as being true. It is improbable that the persons whom the defendant claims to have discovered molesting the track should complete their work after knowing they were detected, and then pursue the one who discovered them in their crime. It is reasonable to suppose that the parties, as soon as they were aware that they were observed, would have fled and left the work unfinished. Again, it is not at all likely that any one, after discovering the persons in the perpetration of the offense at that time of night, would have gone back to bed and lain there until the work was finished, as the defendant contends, and then run to the station and give the alarm. The fact that the defendant apprised the company of the condition of the track is entirely consistent with the theory of the prosecution, that the object of the defendant in committing the offense was to obtain a reward from the company for giving the information.

As to the alleged confessions, the record discloses that they were made freely and voluntarily, and without inducement of any kind. The crime charged was clearly established by other competent testimony, and the proof shows that the defendant was so situated that he had the opportunity to commit it. The alleged confessions or admissions, if true, were sufficient to connect the defendant with the offense. Besides, there is in the record proof of facts and circumstances connected with or surrounding the commission of the offense which tends to establish the defendant's guilt. The evidence would have justified a conviction under both counts of the information. Both offenses were

committed by the same person and at the same time. It is, indeed, unexplainable how the jury arrived at the verdict returned. As a separate offense is charged in each count, the verdict is not void. The defendant cannot complain because he was acquitted of the first offense. The error was in his favor. (*State v. Turner*, 6 Baxt. [Tenn.], 201.)

It is claimed that the venue of the offense was not proven. It is established by uncontradicted testimony that the place where the track was tampered with was not over one-half a mile west of the town of Chapman. The witness A. B. Cady, the agent of the company at Chapman, testified that he had passed by the place, but did not examine it; that it is a part of the Union Pacific Railway and is in the county of Merrick, and state of Nebraska. This was sufficient to authorize the jury in drawing the conclusion that the place of the venue was that laid in the information, there being no evidence tending to show the contrary, although no one testified that the place of the offense was ever pointed out to the witness by a person familiar with its location. The venue of an offense may be proven like any other fact in a criminal case. It need not be established by positive testimony, nor in the words of the information; but if from the facts appearing in evidence the only rational conclusion which can be drawn is that the offense was committed in the county alleged, it is sufficient. It will be presumed that the trial court and jury knew the boundaries of the county where the trial took place and that the town of Chapman was in such county. Suppose, upon a trial of a criminal cause in Lancaster county, it be proven that the alleged offense was committed within one-half mile of the city of Lincoln, would not the venue be as completely established as if a witness had testified that the precise place was in Lancaster county? To ask the question is to evoke an affirmative answer.

There is no material variance between the allegations of

the second count of the information and the testimony introduced to sustain the same. While the second count charges that the obstruction was placed "upon and across" the railroad track and the testimony introduced to sustain said count only shows that the claw-bar was placed upon one of the rails of the track, and not across it, yet the variance between the allegation and proof is immaterial and in no manner prejudicial to the accused. It will be observed that the statute we have quoted makes it a crime punishable by imprisonment in the penitentiary for a person to willfully and maliciously place any obstruction upon the "rail or rails, track or tracks" of a railroad in operation in this state. It is not essential to a conviction that it be established that the obstruction was placed *across* the track, nor was it necessary that the county attorney should have averred that it was so placed, so long as it was charged that it was put upon the railroad track.

It is finally urged that the sentence is excessive. It is within the limits fixed by statute, which makes the maximum punishment in such cases at twenty years' imprisonment and the minimum at one year. The judge, in passing sentence, doubtless took into consideration and gave sufficient weight to the recommendation of the jury to make the sentence light, and to the fact that there was no loss of life or property occasioned by the obstruction and that such was not the motive of the defendant. There does not appear to have been any abuse of discretion in fixing the time of imprisonment, and it will not be disturbed. The judgment is

AFFIRMED.

MAXWELL, CH. J., concurs.

POST, J., having tried the case in the court below, took no part in the decision.