STATE OF NEBRASKA, APPELLEE, v. DAVID C. PHELPS, APPELLANT.

490 N.W.2d 676

Filed October 16, 1992.   No. S-91-577.

David A. Domina and Denise E. Frost, of Domina & Copple, P.C., for appellant.

Don Stenberg, Attorney General, and Donald A. Kohtz for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

## I. STATEMENT OF CASE

Defendant-appellant, David C. Phelps, was, pursuant to verdict, adjudged guilty of kidnapping in violation of Neb. Rev. Stat. § 28-313 (Reissue 1989) and was sentenced to life imprisonment. As treated in his brief, the errors he assigns combine to assert that the district court mistakenly (1) received certain evidence, (2) concluded the evidence was sufficient to support the charge, (3) refused to change the venue, (4) overruled his challenge to the array, and (5) refused certain pretrial discovery. We affirm.

## II. BACKGROUND

On August 13, 1987, 9-year-old Jill Cutshall disappeared; she has not been seen since.

She was a happy, mature, and intelligent child who was outgoing and athletic. She was on good terms with her father, mother, and stepmother and had not expressed any desire to run away.

Although the decree dissolving her biological parents' marriage granted her custody to the mother, at the time of her disappearance the child was living, by the parents' mutual

agreement, with her father and stepmother at the McNeely Apartments in Norfolk, Madison County, Nebraska. The mother was at that time living at Great Bend, Kansas.

On the day of the child's disappearance, the father and stepmother left home at 6 o'clock in the morning. The stepmother noted that the child was then awake but still dressed in a nightshirt. The stepmother also noted that the child had laid out a purple shirt and a pair of blue jeans. Under a relatively new arrangement with the child's babysitter, the child was to leave the McNeely Apartments at approximately 8 a.m. and walk to the sitter's house, some $4^1/_2$ blocks away. If the sitter was not awake when the child arrived, she was to use a key left in the mailbox to let herself in.

The stepmother finished work at 3 o'clock in the afternoon and went directly to the sitter's house to pick up the child. It was then that the stepmother first learned that the child had not arrived at the sitter's house that day. The sitter thought that the child had merely stayed home with her father, as she had done once previously. The sitter's live-in boyfriend did not see the child when he left for work between 7:30 and 7:50 that morning.

After checking with numerous relatives throughout and around Norfolk, the stepmother, at approximately 3:30 or 4 p.m., went to get the child's father at his place of work. After contacting friends and the relatives again as to the child's whereabouts, the father and stepmother went to the Norfolk Police Department. As a result, an intensive search by various law enforcement agencies and private interests ensued.

As the hunting season approached, hunters were asked to watch for evidence related to the child's disappearance. On November 7, 1987, a hunter sporting in the Wood Duck State Special Use Area in Stanton County, Nebraska, discovered what were later identified as the child's blouse, jeans, underwear, shoes, and keys. The underwear was white with numerous clown face or ice cream cone designs. After the scene was secured, a Federal Bureau of Investigation evidence team was immediately dispatched to the area. The bureau's analysis revealed nothing with respect to fingerprints, semen, blood, hairs, or fibers.

Det. Steve Hecker of the Norfolk Police Department began investigating current and former tenants of the McNeely Apartments. Tenant Kermit Baumgartner was interviewed on March 24, 1988, after which he moved out of the apartments. While searching for Baumgartner, Hecker found Phelps, then a 24-year-old man standing 5 feet 10 inches tall and weighing approximately 195 pounds, at Baumgartner's new place of residence. Hecker asked if he would answer some questions at the police department. During the interview which followed, Hecker asked if Phelps knew why Hecker wanted to talk with him. Phelps replied that he thought there were three reasons: he knew the child and used to babysit her, he used to live in the McNeely Apartments, and he knew Baumgartner. Other evidence suggests, however, that Phelps was not living at the McNeely Apartments during the times he said he babysat the child at that location.

Phelps also told Hecker that in June and July 1987, he lived in a tent at the Ray Schoen residence in Norfolk and that he had lived with Larry Pennybacker in nearby Plainview, Nebraska, from late July until late August or early September. In a subsequent interview with Hecker on April 18, 1988, Phelps stated that he was mistaken about where he lived during 1987, now recalling that he lived with Pennybacker and moved back to Norfolk and lived in a tent at Schoen's residence just prior to the child's disappearance.

Brian Pinkelman, a former homosexual partner of Phelps', testified that he lived with Phelps in a tent at Schoen's for 2 weeks and that Phelps had worked with him at Schoen's lawn service on August 13, 1987. It was also shown that Pinkelman had, prior to the child's disappearance, suffered a memory loss due to a head injury inflicted when he was hit by a frying pan and that he had written a suicide note on August 18, 1987.

Schoen testified that he first met Phelps on August 12, 1987, and that Phelps had slept at Schoen's home the night of August 12. Schoen, Phelps, and Pinkelman spent the day of August 13 mowing lawns. After the child disappeared, Schoen also threatened to kill himself.

In a conversation with Hecker on April 29, 1988, Phelps stated that he now recalled that on August 11, 1987, he was

staying with Guy LaChance in the McNeely Apartments and that on the evening of August 12, he was living at the McNeely Apartments in a room rented by Kathy Pendergast. Between 2 and 3 a.m. on August 13, Phelps was removed from the building by his then girl friend and now wife and by Donna Hansen and was taken to Hansen's apartment at the Madison Hotel.

An acquaintance of Phelps' wife testified that in approximately June 1988, she was at a bar with her niece. The acquaintance described her niece as being about 8 or 9 years of age with blond hair and blue eyes and resembling the missing child. Although Phelps had met the niece on previous occasions, he called her by the name Jill at least three or four times during a 1- to 2-hour period. The acquaintance corrected Phelps, telling him that her niece's name was not Jill. The niece also corrected Phelps. The acquaintance asked Phelps why he ·was calling her niece Jill, and Phelps replied that Jill looked a lot like the niece. When the acquaintance dropped Phelps and his now wife off after they left the bar, Phelps again called the niece Jill, for which he apologized. Phelps did not explain who Jill was.

## III. ANALYSIS

With that brief background, we turn our attention to the summarized assignments of error and the facts and law which relate to them.

### 1. EVIDENTIAL RULINGS

The first summarized assignment of error questions the district court's (a) failure to suppress a videotaped statement Phelps gave and (b) receipt into evidence of Phelps' descriptions of his sexual interest in and contacts with young girls.

### (a) Videotaped Statement

In the course of her efforts to find her child, the mother met Roy Stephens, who operated as a finder of missing children and also functioned as a member of a firm of private investigators operating under the name Interstate Bureau of Investigation. Stephens, a bearded felon standing 6 feet 2 inches tall and

weighing 300 pounds, obtained his private investigator's license from the State of Nebraska by lying as to his criminal record. Not only was Stephens not connected with any state or federal law enforcement agencies, he did not have a friendly relationship with law enforcement personnel.

Stephens made his initial contact with Phelps in October 1988, at which time Phelps denied knowing the child. Stephens again met with Phelps on December 3, 1988, at the request of the latter's half sister. During this audiotaped interview, Phelps, to the extent relevant, spoke about his homosexual relationship with Baumgartner and his previous instances of sexual involvement with children. However, he denied knowing Baumgartner at the time of the child's disappearance.

At Stephens' request, two representatives of an Omaha television station traveled to Norfolk on January 4, 1989. Stephens had informed one of these representatives that he was traveling to Norfolk to talk with Phelps because Phelps might know something about the child's disappearance.

The two representatives met with Stephens and Diane Robinette, another Interstate operative, at approximately 11 a.m. at a Norfolk restaurant. During the approximately $1/2$-hour conversation, Stephens told the two representatives that he was going to talk to Phelps and that they could go to Stephens' nearby motel room to wait for Stephens' telephone call. At approximately noon, Stephens and Robinette left the motel, and the two representatives remained.

Meanwhile, in an attempt to locate Phelps, Stephens and Robinette went to his home. Phelps' wife told Stephens that Phelps was on foot and would return shortly. Stephens and Robinette thereupon drove to the parking lot of a nearby store and waited. They soon saw Phelps, and Stephens asked him to come with them, as they needed his help and had something to show him.

Robinette then drove Stephens and Phelps to the Wood Duck area, where the child's clothing had been found. When the threesome got out of the vehicle, Stephens handed Phelps a shovel and told him that the shovel was going to help find the child. At this point Stephens gave his gun to Robinette to hold. Stephens then told Phelps to show him where the child was

buried.

As Phelps led Stephens and Robinette through the area, Stephens incessantly asked, "Is this where Jill is?" Stephens also told Phelps that they were not leaving until they found the child's body. Stephens, in an attempt to encourage Phelps to talk, told Phelps that "I could kill you right here and nobody would ever find you" and that "your wife and daughter would be in some serious trouble."

As Stephens, Robinette, and Phelps walked around, Stephens retrieved his gun from Robinette and fired it into the air. Phelps stated that "surprisingly it didn't startle me and I didn't drop to the ground like somebody might." Stephens testified that he saw no reaction from Phelps after the gunshot. Robinette, however, stated that Phelps was indeed surprised or startled. Stephens commented that "300 pound men don't like nature walks." Phelps then told Stephens that he had heard that the child's body was in the Wood Duck cemetery area. The threesome then walked back to the vehicle, and Robinette drove to the cemetery area.

Upon arrival at the cemetery area, although Stephens left his gun in the vehicle, Phelps walked to a point he selected and began to dig. After Phelps had dug for approximately 20 minutes and was sweating and appeared "fatigued," he told Stephens he was ready to talk. Stephens summoned Robinette to retrieve his tape recorder, and Stephens audiotaped Phelps' statement while in the cemetery area. According to this account, which started at 2:41 p.m. on January 4, Phelps spent the evening of August 12, 1987, with Baumgartner, consuming alcoholic beverages. The next morning, Phelps was awakened by Baumgartner, who told Phelps that he had the child out in his automobile and that they were going for a ride. Baumgartner drove Phelps and the child to the Wood Duck area, where Baumgartner sexually assaulted the child while Phelps held on to her. Phelps described the child's attire as a "light lavender colored . . . blouse . . . and matching shorts" and white or cream-colored underwear with "[l]ittle swirls and stuff on them." Phelps stated that he became "aroused" and nervous and suggested to Baumgartner that they leave. Baumgartner told Phelps to take the automobile back into Norfolk by

himself, and Phelps left in the automobile, leaving the child behind with Baumgartner.

On their return trip to Norfolk, Stephens told Phelps that the two Omaha television representatives were awaiting their arrival. Phelps expressed relief for getting the story off his chest, but he also expressed concern for the safety of his family from Baumgartner.

At approximately 3:30 or 4 p.m. on January 4, 1989, Stephens and Robinette returned to the motel room with Phelps. The motel room door was unlocked, and Phelps was not told that he could not leave or that he could not use the telephone. In addition, Stephens, Robinette, and the two representatives all testified that neither they nor anyone else made any threats to Phelps while he was in the motel room.

Because Phelps again expressed concern for the safety of his wife and child, Stephens left to move Phelps' wife and child to Phelps' half sister's house. The two representatives introduced themselves to Phelps, although it is disputed whether they identified themselves as working for a particular television station. They waited in the motel room, along with Robinette and Phelps, and watched television until Stephens returned. One of the representatives testified that as they watched a show, Phelps laughed and talked about it. This representative testified at trial that she thought they watched the show no later than 4:30 p.m. However, a perhaps incomplete listing of television programs listed the show in question as scheduled for showing by one station at 6:05 p.m.

Robinette testified that Phelps inquired as to whether the motel room television set had free "porno movies." Phelps and Robinette also spoke about the fact that they both had daughters about the same age.

Stephens returned in approximately one-half hour and told Phelps that he had successfully moved his wife and child to Phelps' half sister's house. One of the representatives testified that Phelps appeared to be "relieved." Reintroductions were then made.

One of the representatives asked Phelps if he would talk with them, and Phelps consented. Phelps then gave an approximately 30-minute-long videotaped interview, during

the course of which he in essence calmly repeated the information he had given during the audiotaped interview earlier that day. The representative conducting the interview expressed doubt about Phelps' veracity, testifying at the suppression hearing that she did not believe everything Phelps said during the filming process; although she did not know such to be the case, he seemed to her to ramble and to be making the account up as he went along.

Upon conclusion of the interview, Stephens left to place a telephone call to the child's mother, who then called the Norfolk police. She was then met by Hecker and Det. Herb Angell, after which the three proceeded to the motel room, arriving at approximately 5 p.m., some 5 to 15 minutes after the conclusion of the taping. Phelps agreed to accompany the officers to the police station.

Upon arrival at the station at approximately 5:25 p.m., and after receiving and waiving his *Miranda* rights, Phelps largely confirmed the version of events he described during the videotaped interview. However, he then recanted his statements, telling Hecker that he had fabricated the entire story out of fear, for he felt Stephens was going to kill him with the gun. Phelps then requested a specific attorney, at which time, approximately 6 p.m., police questioning stopped.

After the requested attorney (not the attorney representing Phelps at trial and in this court) met separately with the county attorney and with Phelps, police questioning resumed. Phelps again essentially repeated the story he had given Hecker and Angell when the three first arrived at the station after the videotaping. Hecker then asked Phelps to tell him "what really happened with him and [the child] on the morning of August 13th of 1987." In response, Phelps recited a version of events which largely paralleled the description he gave in his initial interview with Hecker in March 1988. Phelps then began to talk about his problems with alcohol and claimed an inability to remember all the events surrounding August 13, commenting that he may have done something he did not remember. At this point his requested attorney ended the questioning, and Phelps was permitted to depart.

Whether Stephens had his gun in the motel room during

Phelps' interview or, instead, retrieved it from the van to put it away after Phelps had left with the Norfolk police is in dispute; however, it was not until after Phelps had left with Angell and Hecker that the television representatives saw Stephens' gun as he removed it, according to one of the representatives, from underneath his shirt and placed it in a case. Stephens testified that he had not carried the gun under his shirt and told one of the representatives that the gun was for "protection." This representative described the gun as a "big" ."silver" "pistol." Both Stephens and Robinette consciously omitted any reference to the gun in any of their reports to the Norfolk police. Stephens did not reveal the use of the gun at the Wood Duck area until some 10 months later while being interviewed for a national television program.

Phelps argues that as the videotaped statement he gave the television representative was coerced as the result of Stephens' prior conduct, it was erroneously received in evidence in violation of the due process requirement of Neb. Const. art. I, § 3, and the privilege against self-incrimination contained in Neb. Const. art. I, § 12. (The audiotaped statement Phelps gave Stephens at the Wood Duck area was not received in evidence.)

As to the first claim, there is no question that voluntariness is imposed as a constitutional prerequisite to the receipt into evidence of confessions and admissions. See, *State v. Brewer, ante* p. 24, 486 N.W.2d 477 (1992); *State v. Hankins*, 232 Neb. 608, 441 N.W.2d 854 (1989); *Colorado v. Connelly*, 479 U.S. 157, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986). Moreover, relying upon our pronouncement in *State v. Bodtke*, 219 Neb. 504, 363 N.W.2d 917 (1985), Phelps urges it matters not that the coerced statement occurred at the hands of a private party. It is true that *Bodtke* proclaims that the "[u]se of an accused's involuntary statement, whether admission or confession, offends due process and fundamental fairness in a criminal prosecution, because one acting with coercion, duress, or improper inducement transports his volition to another who acts in response to external compulsion, not internal choice." 219 Neb. at 510, 363 N.W.2d at 922. However, at least in the view of one source of commentary, that decision has been called into

question by *Colorado v. Connelly, supra.* 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.2 n.77.2 (Supp. 1991). In *Connelly*, the U.S. Supreme Court ruled that to deprive one of due process, some degree of state action is essential, writing that "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." 479 U.S. at 166. However, as the analysis which follows demonstrates, we need not resolve at this time whether the *Bodtke* rule is nonetheless still viable in this jurisdiction.

The voluntariness of a statement is a question of fact to be determined by the trial court in light of all the surrounding circumstances. See *State v. Brewer, supra.* Moreover, in deciding whether a trial court's ruling on a question of fact is erroneous, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that the trial court has observed the witnesses. See, *State v. Coleman, post* p. 731, 490 N.W.2d 222 (1992); *State v. Brewer, supra.* Thus, a preliminary determination by the trial court that a statement was made voluntarily will not be disturbed on appeal unless clearly wrong. *State v. Brewer, supra.*

Here, the statement with which we are concerned was given not to Stephens at the Wood Duck area, but to him and others in a motel room several hours after Stephens had fired his gun and after Stephens had been away from the room for one-half hour while he took steps to protect Phelps' family from possible harm at the hands of yet another. Under these circumstances, the occurrences at the Wood Duck area cannot be said as a matter of law to have carried over to the statement Phelps made in the motel room. See *State v. Jones*, 327 N.C. 439, 396 S.E.2d 309 (1990) (confession given 26 hours after allegedly coerced statements and at a different place to different interviewers held to be admissible).

Moreover, as to the second claim, Phelps fails to explain how the statement he gave the television representative became the type of official questioning to which article I, § 12, applies. See *State v. Sites*, 231 Neb. 624, 437 N.W.2d 166 (1989).

Accordingly, the district court correctly refused to suppress

the videotaped interview.

### (b) Sexual Interest Statements

Not only did Phelps describe in his videotaped statement his interest in young girls, but Hecker testified that when he interviewed Phelps on April 22, 1988, Phelps recalled six such prior incidents of sexual contact, dating back to 1980. It is the April 22 statement that Phelps, in this portion of the first summarized assignment of error, claims was erroneously admitted into evidence.

The first incident Phelps described occurred when he was approximately 16 years old and living in Arkansas. Phelps stated that he had removed all of his clothing and crawled into bed with a 4-year-old girl and that although nothing occurred, he had a "very strong urge" to have something happen. The second incident, also in 1980, occurred while Phelps was mowing a family's lawn in Valentine, Nebraska, when their 7-year-old daughter asked Phelps to kiss her and he did. The third incident, also believed to be in 1980, occurred in Wayne, Nebraska, when Phelps had taken a 4-year-old neighbor girl up to his room, removed her panties, and felt her buttocks and vagina with his hands. The fourth incident involved the same girl, except that on this occasion Phelps took her behind some bushes in the area to commit similar acts. The fifth incident, the location of which Phelps declined to disclose for fear of being caught, involved a young girl whom Phelps took from a residence to a county road, where he removed her panties and fondled her buttocks and vagina. Phelps was unable to place a date on the sixth incident, but stated that it occurred in Norfolk. On this occasion, he experienced an erection and ejaculated while holding the daughter of some friends of his on his lap. No formal complaints were filed against Phelps for any of these incidents.

Phelps explained that his sexual desires were for girls between the ages of 4 and 6, with blue eyes and blonde hair. When asked specifically about Jill Cutshall, Phelps stated that although he liked her blue eyes and the way she could control people and how she helped others, she was too old for him. Phelps stated that he could not control these urges but that he

now tried to be with adult females.

Neb. Rev. Stat. § 27-404(2) (Reissue 1989) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

We have said that the foregoing is an inclusionary rule permitting the use of relevant evidence of other crimes, wrongs, or acts for purposes other than to prove the character of a person in order to show that such person acted in conformity with that character. Thus, the statute permits evidence of other crimes, wrongs, or acts if such is relevant for a purpose other than to show a defendant's propensity or disposition to commit the crime charged. See, *State v. Stephens*, 237 Neb. 551, 466 ·N.W.2d 781 (1991); *State v. Donhauser*, 231 Neb. 114, 435 N.W.2d 186 (1989). The rule thus permits the introduction of evidence of other crimes, wrongs, or acts for the purposes of showing such things as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *State v. Nesbitt*, 226 Neb. 32, 409 N.W.2d 314 (1987).

The evidence admissible under the rule is, of course, limited by Neb. Rev. Stat. § 27-403 (Reissue 1989), which provides for the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of, among other things, unfair prejudice. *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987).

That the child's clothing was found at a secluded place suggests a sexual motive for the abduction; thus, the evidence of Phelps' prior acts is clearly relevant as tending to show his motive for kidnapping Jill Cutshall, that is, to achieve sexual gratification through assaulting her.

Phelps' contention that the events he described were too remote in time to be admissible overlooks that the question of remoteness is a matter within the discretion of the trial court. See *State v. Keithley*, 218 Neb. 707, 358 N.W.2d 761 (1984). "[T]here is no magic in the amount of time by which the other

offenses must have preceded or followed the case being tried . . . ." *State v. Ellis*, 208 Neb. 379, 393, 303 N.W.2d 741, 750 (1981). Although remoteness in time may weaken the value of the evidence, such remoteness does not, in and of itself, necessarily justify exclusion of the evidence. *State v. Yager*, 236 Neb. 481, 461 N.W.2d 741 (1990); *State v. Rincker*, 228 Neb. 522, 423 N.W.2d 434 (1988). As this court held in *State v. Schaaf*, 234 Neb. 144, 160, 449 N.W.2d 762, 772 (1989),

> remoteness, or the temporal span between a prior crime, wrong, or other act offered as evidence under Rule 404(2) and a fact to be determined in a present proceeding, goes to the weight to be given to such evidence and does not render the evidence of the other crime, wrong, or act irrelevant and inadmissible.

Accord *State v. Yager*, supra.

Phelps also erroneously urges that the evidence is irrelevant because the prior acts all involved consenting children and thus bore no relationship to the crime prosecuted. The fact is that aside from the incident in Valentine where the girl asked Phelps to kiss her, the record is devoid of evidence of consent. Granted, the crime charged is not identical in every respect to Phelps' prior acts. In each of the prior incidents, Phelps did not abduct and transport the child in an automobile to sexually assault her. However, the prior acts need not be identical to the act charged in order to be admissible. It is sufficient that the evidence be of similar involvement reasonably related to the charged conduct and be presented in a manner in which prejudice does not outweigh its probative value. *State v. Sherrod*, 229 Neb. 128, 425 N.W.2d 616 (1988). The thread which ties the prior acts to the crime in question is the use of young girls to achieve sexual gratification.

Balancing the probative value of evidence against the danger of unfair prejudice is also within the discretion of the trial court. *State v. Stephens, supra*, citing *State v. Jacobs, supra*. The primary consideration in this connection is whether the probative value of the evidence is outweighed by the danger of its unfair prejudice. For exclusion, it is not enough that the evidence is merely prejudicial, for most, if not all, of the evidence a party offers is calculated to be prejudicial to the

opposing party. Thus, it is only evidence which has a tendency to suggest a decision on an improper basis that is unfairly prejudicial and the concern of § 27-403. *State v. Stephens, supra.*

Because the evidence bears on the matter of Phelps' motive to abduct the child, it cannot be said as a matter of law that the evidence had a tendency to suggest a decision on an improper basis. Accordingly, the district court correctly received the evidence.

### 2. SUFFICIENCY OF EVIDENCE

In the second summarized assignment of error, Phelps claims that the evidence was insufficient to support the conviction in that (a) the crime itself was not proved and (b) the location of the crime was not proved.

### (a) The Crime

Section 28-313 provides, in relevant part, that one "commits kidnapping if he abducts another or, having abducted another, continues to restrain him with intent to . . . (d) Commit a felony . . . ."

Under the provisions of Neb. Rev. Stat. § 28-320.01 (Reissue 1989), one who is at least 19 years of age commits the felony of sexually assaulting a child "if he or she subjects another person fourteen years of age or younger to sexual contact . . . ."

Neb. Rev. Stat. § 28-206 (Reissue 1989) provides that one who "aids, abets, procures, or causes another to commit any offense may be prosecuted and punished as if he were the principal offender."

As is well known, in determining the sufficiency of the evidence to support a finding of guilt in a criminal case, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Those matters are for the finder of fact, whose findings must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support them. *State v. Williams,* 239 Neb. 985, 480 N.W.2d 390 (1992); *State v. Kennedy,* 239 Neb. 460, 476 N.W.2d 810 (1991).

Accordingly, Phelps' admissions, combined with the child's disappearance and the discovery of her clothes, adequately

support the conviction. Although, except for the admissions, the evidence is largely circumstantial, such evidence is to be treated in criminal cases the same as direct evidence, the State being entitled upon review to have all conflicting evidence, direct and circumstantial, viewed in its favor. *State v. Morley*, 239 Neb. 141, 474 N.W.2d 660 (1991). Thus, circumstantial evidence is adequate to support a conviction if the evidence, taken as a whole, establishes guilt beyond a reasonable doubt. *State v. Kennedy, supra.*

### (b) Location of Crime

Phelps also urges that in any event, the evidence fails to establish that the crime occurred in Madison County, where it was prosecuted.

This claim rests on the fact that a variety of people thought they had seen the child at a multiplicity of places. For example, according to two witnesses, a girl resembling the child was seen at approximately 6:30 on the morning of her disappearance walking down a Norfolk street. Another witness saw a girl matching the child's description at approximately 6:30 to 6:45 a.m. of the same day sitting on the steps of the babysitter's residence. When this witness passed the babysitter's residence on her return trip some 5 minutes later, she did not see the girl. A girl resembling the child was also seen near the McNeely Apartments between approximately 6:30 and 6:45 a.m. of that day by another witness. Still another witness thought she saw the child and another young girl in the store at which the witness worked around 10 a.m. on the day of the child's disappearance. A young witness testified that she spoke with a girl resembling the child on the afternoon of that day at the same store. A man from Valley, Nebraska, believed he saw a girl resembling the child leaving a Fremont hotel with an older man on August 14, 1987. A woman from Ames, Nebraska, testified that shortly after the child's disappearance, she saw a girl resembling the child in a van traveling south out of West Point, Nebraska. A woman from Norfolk testified that the child was with another girl at a truckstop 5 miles north of Norfolk at 1 to 1:30 a.m. on August 14, 1987. A woman living approximately a block away from the McNeely Apartments testified that the child and

another girl cut across her lawn between 12 and 1 p.m. on August 13, 1987. Yet another woman testified that she saw a girl resembling the child in a shopping mall in Sioux City, Iowa, on Saturday, August 15.

There is no question that in the absence of a defendant's waiver, the State has the burden to prove proper venue beyond a reasonable doubt. *State v. Gorman*, 232 Neb. 738, 441 N.W.2d 896 (1989); *State v. Vejvoda*, 231 Neb. 668, 438 N.W.2d 461 (1989); *State v. Lindsey*, 193 Neb. 442, 227 N.W.2d 599 (1975).

" 'The venue of an offense may be proven like any other fact in a criminal case. It need not be established by positive testimony, nor in the words of the information; but if from the facts appearing in evidence the only rational conclusion which can be drawn is that the offense was committed in the county alleged, it is sufficient.' "

*State v. Gorman*, 232 Neb. at 740, 441 N.W.2d at 898, quoting *State v. Vejvoda, supra*. Accord *Weinecke v. State*, 34 Neb. 14, 51 N.W. 307 (1892).

Generally, all criminal cases are to be tried in the county where the offense was committed. Neb. Rev. Stat. § 29-1301 (Reissue 1989). However, Neb. Rev. Stat. § 29-1301.01 (Reissue 1989) provides that if an offense is committed against the person of another, the accused may be tried in the county in which the offense is committed, or in any county into or out of which the victim may have been brought in the prosecution of the offense, or in which an act is done by the accused in instigating, procuring, promoting, or aiding in the commission of the offense, or in aiding, abetting, or procuring another to commit such offense. Accord, *State v. Tiff*, 199 Neb. 519, 260 N.W.2d 296 (1977); *State v. Garza*, 191 Neb. 118, 214 N.W.2d 30 (1974).

An example of the proof needed to prove venue is found in *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981). The defendant therein was convicted of manslaughter in Lancaster County. The evidence showed that the victim was last seen on October 3, 1974, in that county; however, her remains were discovered on September 13, 1978, in Cass County. Although there was no direct evidence that the defendant had transported the victim from the first to the second county, the circumstantial

evidence of defendant's prior conduct and acquaintance with the victim was held sufficient to establish that the crime took place in Lancaster County.

Notwithstanding that the child's clothing was found in Stanton County and that Phelps contends his getting out of the vehicle, holding the child's arms, becoming aroused, being frightened, and departing all occurred in Stanton County, the facts remain that the child and her father and stepmother lived in Madison County, as did the child's babysitter, where the child was to be on August 13, 1987, and that the child did not have the ability to transport herself out of Madison County. Accordingly, there is sufficient circumstantial evidence from which a fact finder could reasonably conclude that the child was originally abducted in Madison County, and the district court thus correctly submitted the issue of venue to the jury.

### 3. REFUSAL OF VENUE CHANGE

Phelps contends in the third summarized assignment of error that the district court incorrectly overruled his motion for a change of venue because, as a result of the publicity surrounding the matter, it was impossible for him to receive a fair trial in Madison County.

There is no question that extensive local, state, and national publicity surrounded the child's disappearance and the trial to follow. The coverage included attention by local and state newspapers, local radio, and both regional and national television. In addition to establishing the foregoing, Phelps also produced 32 affidavits of Madison County citizens, each asserting that due to the media coverage the affiant could not serve as a fair, impartial juror in the case. In addition, Phelps produced the affidavits of Madison County trial lawyers expressing the opinion that a fair and impartial trial could not be held in Madison County.

Section 29-1301 permits a change of venue when it appears that "a fair and impartial trial cannot be had" in the county where the offense was committed. A motion for change of venue is addressed to the discretion of the trial judge, whose ruling will not be disturbed absent an abuse thereof. *State v. Williams*, 239 Neb. 985, 480 N.W.2d 390 (1992); *State v.*

*Boppre*, 234 Neb. 922, 453 N.W.2d 406 (1990); *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987); *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987); *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986); *State v. Irwin*, 191 Neb. 169, 214 N.W.2d 595 (1974).

In arguing his position, Phelps places undue reliance on *Rideau v. Louisiana*, 373 U.S. 723, 83 S. Ct. 1417, 10 L. Ed. 2d 663 (1963). Therein, the defendant was charged with robbery, kidnapping, and murder. He was filmed while being interrogated in jail by the sheriff, during the course of which, in response to leading questions, the defendant admitted the crimes in detail. The film was broadcast on television on three separate occasions, reaching at least one-third of the population in the parish in which he was tried and convicted. In holding that the denial of a change of venue amounted to a denial of due process, the U.S. Supreme Court noted that "[f]or anyone who has ever watched television the conclusion cannot be avoided that this spectacle, to the tens of thousands of people who saw and heard it, in a very real sense *was* Rideau's trial—at which he pleaded guilty to murder." (Emphasis in original.) 373 U.S. at 726.

However, in *Murphy v. Florida*, 421 U.S. 794, 799, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975), the U.S. Supreme Court wrote:

> The proceedings in [*Rideau*] were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob. [*Rideau*] cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process.

Thus, mere jury exposure to news accounts of a crime does not presumptively deprive a criminal defendant of due process. Rather, to warrant a change of venue, a defendant must show the "existence of pervasive misleading pretrial publicity." *State v. Bradley*, 236 Neb. 371, 386, 461 N.W.2d 524, 536 (1990), *cert. denied* ____ U.S. ____, 112 S. Ct. 143, 116 L. Ed. 2d 109 (1991). Indeed, in order for a defendant to successfully move for a change of venue based on pretrial publicity, he or she must

show that the "publicity has made it impossible to secure a fair and impartial jury." *State v. Jacobs*, 226 Neb. at 190, 410 N.W.2d at 473. Accord *State v. Heathman*, 224 Neb. 19, 395 N.W.2d 538 (1986). A number of factors must be evaluated in determining whether that burden has been met, including the nature of the publicity, the degree to which the publicity has circulated throughout the community, the degree to which the publicity circulated in areas to which venue could be changed, the length of time between the dissemination of the publicity complained of and the date of trial, the care exercised and ease encountered in the selection of the jury, the number of challenges exercised during the voir dire, the severity of the offenses charged, and the size of the area from which the venire was drawn. *State v. Williams, supra*; *State v. Red Kettle*, 239 Neb. 317, 476 N.W.2d 220 (1991); *State v. Jacobs, supra*; *State v. Bird Head, supra*; *State v. Kern, supra*; *State v. Heathman, supra*; *State v. Fallis*, 205 Neb. 465, 288 N.W.2d 281 (1980); *State v. Ell*, 196 Neb. 800, 246 N.W.2d 594 (1976).

As noted in *State v. Bradley, supra*, voir dire examination provides the best opportunity to determine whether venue should be changed. A jury was able to be selected in this case in approximately 4 hours. At the conclusion of that process, each of the venirepersons seated as a juror raised his or her hand in response to Phelps' inquiry as to whether each felt that he or she

> could serve on this jury and fairly try this case free of influence of anything you have heard before this day and based exclusively on what comes from this chair and the exhibits that are received, free of any sense at all of any expectation by the community or your family or neighbors or anything else[.]

Under the circumstances, we cannot say the district court abused its discretion in denying Phelps' request for a change of venue. As we have noted in the past, the law does not require that a juror be totally ignorant of the facts and issues involved; it is sufficient if the juror can lay aside his or her impression or opinions and render a verdict based upon the evidence presented in court. *State v. Bradley, supra*.

### 4. Preservation of the Array

In a related move, Phelps, in the fourth summarized assignment of error, contends that the district court should have sustained his challenge to the array, as all the venirepersons had formed or expressed an opinion about the case.

The principles considered in connection with the third summarized assignment of error in large measure resolve this issue as well. The fact that many, most, or even all the jurors knew something about the case in advance would not entitle Phelps to a change of venue, for a criminal defendant is not guaranteed a jury totally ignorant of the facts and circumstances of his or her case. See, *State v. Williams*, 239 Neb. 985, 480 N.W.2d 390 (1992); *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 589 (1975). It is sufficient if the juror can lay aside his or her impressions or opinion and render a verdict based on the evidence presented at trial. *Irvin v. Dowd*, 366 U.S. 717, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *State v. Williams, supra*; *State v. Jacobs*, 226 Neb. 184, 410 N.W.2d 468 (1987); *State v. Bird Head*, 225 Neb. 822, 408 N.W.2d 309 (1987); *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986); *State v. Navarrete*, 221 Neb. 171, 376 N.W.2d 8 (1985); *State v. Torrence*, 192 Neb. 213, 219 N.W.2d 772 (1974), *cert. denied* 420 U.S. 928, 95 S. Ct. 1127, 43 L. Ed. 2d 399 (1975). Moreover, Neb. Rev. Stat. § 25-1636 (Reissue 1989) provides that

> [i]t shall not be a cause of challenge that a juror has read in the newspapers an account of the commission of a crime with which a prisoner is charged, if such juror shall state on oath that it is the belief of said person that he or she can render an impartial verdict according to the law and the evidence; and the court shall be satisfied as to the truth of such statement . . . .

See, also, Neb. Rev. Stat. § 29-2006 (Reissue 1989).

A careful review of the voir dire in this case indicates no hostility toward Phelps by the jurors who served in his trial as to suggest a partiality that could not be set aside. Indeed, the district court scrupulously inquired as to the extent to which prospective jurors had expressed opinions regarding the crime, excusing those who indicated that they might not be able to set

aside their knowledge or opinions of the crime and fairly and impartially judge Phelps on the evidence presented at trial.

### 5. NONDISCOVERY

In the fifth and final summarized assignment of error, Phelps asserts the district court erred in overruling his motion to discover the materials accumulated by the Federal Bureau of Investigation.

In May and June 1990, a bureau agent operated covertly at a Perry, Iowa, restaurant at which Phelps worked. During this time, over 18 hours of conversation between the agent and Phelps were recorded. The audiotapes were made available to Phelps. Upon Phelps' offer, the jury heard approximately 45 minutes of the more than 1,080 minutes of the covertly recorded conversations between the bureau's agent and Phelps. Our review of that 45 minutes establishes nothing of relevance to the issues presented.

Discovery in a criminal case is, in the absence of a constitutional requirement, controlled by either a statute or court rule. Thus, unless granted as a matter of right under the Constitution or other law, discovery is within the discretion of the trial court, whose ruling will be upheld on appeal unless the trial court has abused its discretion in the discovery ruling. *State v. Tuttle*, 238 Neb. 827, 472 N.W.2d 712 (1991); *State v. Meis*, 217 Neb. 770, 351 N.W.2d 79 (1984); *State v. Pierce and Wells*, 215 Neb. 512, 340 N.W.2d 122 (1983).

The U.S. Constitution requires the State to disclose exculpatory material to an accused. *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), recognized that the suppression by the State of evidence favorable to and requested by an accused violates due process where the evidence is material to the guilt of the defendant. *State v. Meis, supra*. In *Moore v. Illinois*, 408 U.S. 786, 794-95, 92 S. Ct. 2562, 33 L. Ed. 2d 706 (1972), the U.S. Supreme Court explained that

> [t]he heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution

after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.

However, the State is not under a constitutional duty to disclose all information that might affect the jury's verdict. *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976). Rather, a prosecutor has a duty to disclose all material exculpatory evidence. *Brady v. Maryland, supra.* As we said in *State v. Tweedy*, 224 Neb. 715, 718, 400 N.W.2d 865, 868 (1987), citing *State v. Rice*, 214 Neb. 518, 335 N.W.2d 269 (1983): "In order to be a material omission, the omitted proposed evidence must create a reasonable doubt as to the defendant's guilt that did not otherwise exist. That the evidence 'might' influence the outcome is insufficient."

Neither has the U.S. Supreme Court found any constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. *Moore v. Illinois, supra.*

Since Phelps was provided the tapes of his own statements, as required by Neb. Rev. Stat. § 29-1912 (Reissue 1989), we cannot under the circumstances say the district court abused its discretion in refusing to require that the State obtain the remainder of the bureau's file and deliver it to Phelps.

## IV. JUDGMENT

For the foregoing reasons, we, as first said in part I above, affirm the judgment of the district court.

AFFIRMED.